David A. Nelson (*pro hac vice* forthcoming)
(Ill. Bar No. 6209623)
davenelson@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
500 West Madison St., Suite 2450
Chicago, Illinois 60661
Telephone:  (312) 705-7400
Facsimile:  (312) 705-7401

Karen P. Hewitt (SBN 145309)
kphewitt@jonesday.com
Randall E. Kay (SBN 149369)
rekay@jonesday.com
JONES DAY
4655 Executive Drive, Suite 1500
San Diego, California 92121
Telephone:  (858) 314-1200
Facsimile:   (844) 345-3178

Evan R. Chesler (*pro hac vice* forthcoming)
(N.Y. Bar No. 1475722)
echesler@cravath.com
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza, 825 Eighth Avenue
New York, NY 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Attorneys for Plaintiff*
QUALCOMM INCORPORATED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| QUALCOMM INCORPORATED, | Case No. **'17 CV 2403 BAS NLS** |
| Plaintiff, | **COMPLAINT FOR PATENT INFRINGEMENT** |
| v. | |
| APPLE INCORPORATED, | **[DEMAND FOR A JURY TRIAL]** |
| Defendant. | |

Plaintiff Qualcomm Incorporated ("Qualcomm"), by its undersigned attorneys, alleges, with knowledge with respect to its own acts and on information and belief as to other matters, as follows:

<u>NATURE OF THE ACTION</u>

1.      Qualcomm brings this action to compel Apple to cease infringing Qualcomm's patents and to compensate Qualcomm for Apple's extensive infringement of Qualcomm's patented technologies.

2.      Qualcomm is one of the world's leading technology companies and a pioneer in the mobile phone industry.  Its inventions form the very core of modern mobile communication and enable modern consumer experiences on mobile devices and cellular networks.

3.      Since its founding in 1985, Qualcomm has been designing, developing, and improving mobile communication devices, systems, networks, and products. Among other innovations, it has invented many technologies that enable cellular communications around the world.  For instance, Qualcomm developed fundamental technologies at the heart of 2G, 3G, and 4G cellular communications, is one of a handful of companies leading the development of the next-generation 5G standard, and has developed numerous innovative features used in virtually every modern cellular device.

4.      Qualcomm also invests in technologies developed by other companies and has acquired companies (and their patented technologies) as part of its emphasis on supporting innovation.  Qualcomm's patent portfolio currently includes more than 130,000 issued patents and patent applications worldwide.  Hundreds of mobile device suppliers around the world have taken patent licenses from Qualcomm.

5.      Apple is the world's most profitable seller of mobile devices.  Its iPhones and other products enjoy enormous commercial success.  But without the innovative technology covered by Qualcomm's patent portfolio, Apple's products would lose much of their consumer appeal.  Apple was a relatively late entrant in the

mobile device industry, and its mobile devices rely heavily on the inventions of Qualcomm and other companies that Qualcomm has invested in.  While Apple is trying to take credit for "creat[ing] the modern smartphone as a product category," it was the pioneering inventions by Qualcomm that created the smartphone.  *Nearly a decade before Apple released the iPhone*, Qualcomm unveiled its own full-feature, top-of-the-line smartphone, the "pdQ 1900."  According to CNN's 1999 holiday buying guide, Qualcomm's pdQ 1900 "lets you make calls, keep records, send email, browse the web and run over a thousand different applications, all while on the go.  Although a cell phone, it is one of the first truly portable, mobile and multipurpose Internet devices."[1]  And there were many follow-on devices with similar capabilities, long before the iPhone.  Without question, Qualcomm, not Apple, created the smartphone product category and Apple cannot rewrite history through slick marketing.  While Qualcomm no longer markets phones directly to consumers, it continues to lead the development of cutting-edge technologies that underpin a wide range of important wireless-device features.  Other companies, like Apple, now manufacture and market phones that feature Qualcomm's innovations and the innovations of other technology pioneers that Qualcomm invested in.

6.      Qualcomm's innovations have influenced all smartphones, and Apple—like other major mobile device makers—utilizes Qualcomm's technologies. Qualcomm's patented features enable and enhance popular features that drive consumer demand, for example, instinctive instant messaging responses, multi-purpose power buttons, cameras that automatically focus on a desired location, intuitive user interfaces for switching between applications, and interacting with displayed content using gestures, among many others.

7.      In contrast to Qualcomm's lengthy history as a pioneer innovator of mobile technology, including the smartphone and technologies consumers demand

---

[1]   http://edition.cnn.com/1999/TECH/ptech/12/03/qualcomm.pdq/.

in all smartphones, Apple is primarily an assembler of technologies it acquires or takes.  Apple has admitted to its history of knowingly copying technology and being late in implementing technologies innovated by others.  Indeed, Apple's founder boasted that Apple "steals" the great ideas of others—specifically, that "we have always been shameless about stealing great ideas."[2]  Apple employees likewise admit that Apple—a relatively late entrant in the mobile space—did not invent many of the iPhone's features.  Instead, Apple incorporated, marketed, and commercialized the work of others: "I don't know how many things we can come up with that you could legitimately claim we did first. . . . We had the first commercially successful version of many features but that's different than launching something to market first."[3]

8.     Qualcomm has invested millions of dollars in this technology and now owns much of the technology that Apple has been using without permission for years.  Qualcomm, and the companies Qualcomm invested in, invented many core technologies that make the iPhone (and other smartphones and mobile devices) desirable to consumers in their daily lives.

9.     But rather than pay Qualcomm for the technology Apple uses, Apple has taken extraordinary measures to avoid paying Qualcomm for the fair value of Qualcomm's patents.  Apple is the quintessential example of a company engaging in patent hold-out, and has repeatedly pursued a patent hold-out strategy using its enormous financial resources to harm innovators of technologies it uses.  More

---

[2]   Interview with Steve Jobs, available at https://www.youtube.com/watch?v=CW0DUg63lqU ("Picasso had a saying, 'good artists copy, great artists steal.'  And we have always been shameless about stealing great ideas.").

[3]   April 2010 email from Apple's iPhone Product Marketing Manager, Steve Sinclair, reported in: Rick Merritt, *Schiller 'shocked at 'copycat' Samsung phone*, Embedded (Aug. 3, 2012), http://www.embedded.com/print/4391702 (April 21, 2017 snapshot of page, accessed via Google's cache).

recently, on January 20, 2017, Apple sued Qualcomm in this district, asserting an array of excuses to avoid paying fair-market, industry-standard rates for the use of certain of Qualcomm's pioneering patents that are critical to all smartphoneslike the iPhone.  *See* Case No. 3:17-cv-00108-GPC-MDD.  Apple also encouraged the companies that manufacture the iPhone to breach their contracts with Qualcomm by refusing to pay for the Qualcomm technology in iPhones, something that those manufacturers had done for many years, without complaint, before Apple's direction to stop.  Further, Apple misled governmental agencies around the world into investigating Qualcomm in an effort to indirectly exert leverage over Qualcomm.

10.     Many of Qualcomm's patents are essential to certain cellular or other standards ("Standard Essential Patents"), such that the use of an underlying technological standard would require use of the patent.  Qualcomm owns a wide range of non-standard-essential patents for inventions in various technologies related to mobile devices.  A significant number of those patents are encompassed by Qualcomm's patent licenses with Apple's manufacturers of iPhones, and Apple is aware that Qualcomm cannot pursue Apple for infringement of those licensed patents.  But many other patents covering cutting edge technologies used in iPhones -- are not included in licenses to Apple's iPhone manufacturers that Apple has infringed upon.

11.     In this suit, Qualcomm asserts a set of five non-standard-essential patents infringed by Apple's mobile electronic devices.  The patents asserted in this suit represent only a small fraction of the Qualcomm non-standard-essential patents that Apple uses without a license.  Several of these innovations were developed long before Apple sold its first iPhone which Apple freely borrowed from to make their products.

12.     Qualcomm repeatedly offered to license its patents to Apple.  But Apple has repeatedly refused offers to license Qualcomm's patents on reasonable

terms.  Qualcomm therefore seeks to enforce its rights in the patents identified below and to address and remedy Apple's flagrant infringement of those patents.

PARTIES

13.     Qualcomm is a Delaware corporation with its principal place of business at 5775 Morehouse Drive, San Diego, California.  Since 1989, when Qualcomm publicly introduced Code Division Multiple Access ("CDMA") as a commercially successful digital cellular communications standard, Qualcomm has been recognized as an industry leader and innovator in the field of mobile devices and cellular communications.  Qualcomm owns more than 130,000 patents and patent applications around the world relating to cellular technologies and many other valuable technologies used by mobile devices.  Qualcomm is a leader in the development and commercialization of wireless technologies and the owner of the world's most significant portfolio of cellular technology patents.  Qualcomm derives a substantial portion of its revenues and profits from licensing its intellectual property.  Qualcomm is also a world leader in the sale of chips, chipsets, and associated software for mobile phones and other wireless devices.

14.     Apple is a corporation organized and existing under the laws of the State of California, with its principal place of business at 1 Infinite Loop, Cupertino, California.  Apple designs, manufactures, and sells throughout the world a wide range of products, including mobile devices that incorporate Qualcomm's multi-touch-gesture, autofocus, multitasking-interface, quick-charging, and machine-learning patents.

JURISDICTION AND VENUE

15.     This action arises under the patent laws of the United States of America, 35 U.S.C. § 1 *et seq.*  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

16.     This Court has personal jurisdiction over Apple because it is organized and exists under the laws of California.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) and 28 U.S.C. § 1400(b).  Venue is appropriate under 28 U.S.C. 1400(b) at least because Apple is incorporated in California and because Apple has committed acts of infringement and has a regular and established place of business in this district.  Apple's acts of infringement in this district include but are not limited to sales of the Accused Products at Apple Store locations in this district, including but not limited to 7007 Friars Road, San Diego, CA 92108 and 4505 La Jolla Village Drive, San Diego, CA 92122.

<u>STATEMENT OF FACTS</u>

**Qualcomm Background**

18.     Qualcomm was founded in 1985 when seven industry visionaries came together to discuss the idea of providing quality communications.  For more than 30 years, Qualcomm has been in the business of researching, designing, developing, and selling innovative semiconductor and cellular technology and products for the telecommunications and mobile technology industries.

19.     When Qualcomm was founded, cellular phones were cumbersome, heavy, and expensive devices that supplied inconsistent voice communications— audio quality was poor, users sometimes heard portions of others' calls, handoffs were noisy, and calls frequently dropped.  Qualcomm played a central role in the revolutionary transformation of cellular communications technologies.  Today, cellular devices are remarkably powerful and can deliver reliable voice service and lightning-fast data to billions of consumers around the world at affordable prices.

20.     Qualcomm is now one of the largest technology, semiconductor, and telecommunications companies in the United States.  It employs over 18,000 people in the United States, 68 percent of whom are engineers, and it occupies more than 92 buildings (totaling over 6.5 million sq. ft.) in seventeen states and the District of Columbia.

21.     Qualcomm's industry-leading research and development efforts, focused on enabling cellular systems and products, are at the core of Qualcomm's business.  Since its founding, Qualcomm has invested tens of billions of dollars in research and development related to cellular, wireless communications, and mobile processor technology.  Qualcomm's massive research and development investments have produced numerous innovations.  Because of this ongoing investment, Qualcomm continues to drive the development and commercialization of successive generations of mobile technology and is one of a handful of companies leading the development of the next-generation 5G standard.

22.     In addition to Qualcomm's investments in research and development internally, Qualcomm has a rich history of investing in and acquiring technologies developed by other industry leaders.  By purchasing companies and patents from companies who desire to sell their innovations, Qualcomm has fostered innovation by enabling those companies to realize a return on their research and development investments and, therefore, incentivizes additional research and development.  Those investments have included, for example, the acquisition of patents related to user interface technology from mobile technology pioneer Palm and multi-gesture touchscreen technologies from TouchTable.

23.     As a result of the strength and value of Qualcomm's patent portfolio, virtually every major mobile device manufacturer in the world has taken a royalty-bearing license to Qualcomm's patent portfolio.  The licenses to Qualcomm's patents allow manufacturers to use numerous forms of critical and innovative Qualcomm technology without having to bear the multi-billion dollar, multi-year costs of developing those innovations themselves.

### Apple Background

24.     Apple has built the most profitable company in the world, thanks in large part to products that rely on Qualcomm's patented technologies.  With a market capitalization of more than $700 billion, $246 billion in cash reserves, and a

global sphere of influence, Apple has more money and more influence than many countries.  Relying heavily on Qualcomm technology and technology Qualcomm has acquired, Apple has become the dominant player in mobile device sales.  Apple's dominance has grown every year since the iPhone's launch in 2007.  In recent years, Apple has captured upwards of *90 percent of all profits* in the smartphone industry.

### Palm Patents

25.     Qualcomm licenses its extensive portfolio of patents to others within the telecommunications and mobile device industry.  Qualcomm also seeks out valuable additions to its patent portfolio.  In January 2014, Qualcomm invested in a large portfolio of patents formerly held by Palm, an early smartphone and mobile operating system pioneer.

26.     Palm launched its iconic PalmPilot in 1996.  The PalmPilot, a Personal Digital Assistant ("PDA") that could be used with a stylus and shorthand alphabet, was a widespread success.

27.     As the capabilities of mobile devices advanced throughout the late 1990s and 2000s, Palm developed mobile operating systems incorporating advanced functionality.  For example, during the 2000s, mobile devices had become capable of running multiple applications simultaneously.  Users of popular desktop computer operating systems, like Microsoft Windows or Mac OS, were accustomed to multitasking between multiple applications with ease.  Multitasking on mobile devices, however, was more difficult at the time largely because the devices had small screens, which made navigating between different applications cumbersome.  Palm had a solution to this multitasking problem.  Palm developed user interface technology that allowed applications running simultaneously to be represented to a user as individual "cards" that could then be seamlessly navigated between by a user.  More specifically, in the schema developed by Palm, mobile device users can view, interact with, manipulate, initiate, and dismiss multiple applications displayed

1   as cards.  *See* U.S. Patent No. 8,683,362 ("the '362 patent").  The figure below

2   illustrates one such embodiment of Palm's innovative multitasking user interface

3   where each running application is represented by a card labeled A through E:



14       28.      Palm debuted its innovative user interface technology in January 2009

15   as part of its WebOS operating system.  The mobile device industry has thus long

16   known about Palm's patented multitasking user interface as well as its technical

17   superiority to other options, such as those on existing iOS devices.  In a January

18   2010 article discussing the yet-to-be-released iPad, Gizmodo noted that "Palm's

19   Web OS solves th[e] [multitasking-interface issue] elegantly," and that Apple would

20   need some other user interface to solve the problem on its devices.[4]  But rather than

21   develop its own multitasking and switching technology, because Apple was a late

22   entrant into the mobile device field and needed to improve its user interface, Apple

23   copied Palm's patented "card" schema starting with iOS 7 in 2013.  And some in the

24   industry knew it.  A 2013 article in The Verge recognized that "Apple's new

25   multitasking menu" was an interface that "has its origins elsewhere" and that "[f]or

26   anyone that's used a Palm Pre . . . the ancestry of modern multitasking is

---

28   [4] http://gizmodo.com/5452501/the-apple-tablet-interface-must-be-like-this.

clear.  Palm's highly innovative webOS introduced card-based multitasking to the world over four years ago, with horizontally scrolling preview panes that could be closed with a simple swipe away."[5]  When Apple recently unveiled its iPhone X on September 12, 2017, an article in TechCrunch described the new multitasking interface as a "déjà vu" of the webOS running on the Palm Pre and that "in the iPhone X you're looking at a little ghost of the Pre."[6]  This is precisely the technology Apple adopted, and continues to adopt, without permission or license.

29.     Palm also was responsible for developing other valuable technology to improve the functionality of mobile devices and the user's experience.  For example, around 2007, Palm developed an innovative feature to allow a user to automatically focus ("autofocus") a digital camera by touching a location on a touchscreen display coupled to the camera, embodied in U.S. Patent No. 8,497,928 ("the '928 patent").  Palm's invention in the '928 patent allows a mobile device user to use a touchscreen to select a new focal point on a displayed image using one type of input (such as a tap or a press), causing the device's camera to refocus to that point and adjust the flash intensity accordingly.  The user can then capture the displayed image though another type of input on the touchscreen, such as a different tap or press on the screen.  Palm's innovations in using a touchscreen to control autofocus and flash functions have made taking high-quality photos on mobile devices far easier.  And again, Apple has adopted this technology without permission or license.

30.     Palm also developed a multi-use power button function on a mobile device that offers control of both the computing and telephony functions of a device, embodied in U.S. Patent No. 9,203,940 ("the '940 patent").  Palm's development in the '940 patent allows a mobile device user to use a single power button to control

---

[5]  http://www.theverge.com/2013/6/11/4418188/apple-ios-7-design-influences.

[6]  https://techcrunch.com/2017/09/13/the-iphone-x-reveals-why-tim-cook-was-so-mad-about-palm/?ncid=rss

multiple functions of a mobile device such as silencing a ring and also turn on the backlight of the display.  Palm's innovation has simplified the operation of mobile devices by minimizing physical buttons, freeing up more space for the touch screen, and allowing the mobile device to become smaller.  Apple used this technology as early as their iPhone 4 without permission or license.

31.    Moreover, in 2005, Palm invented the ability to respond to an incoming phone call with a text message instead of, *e.g.*, answering the call, declining the call, or sending the call directly to voicemail.  That technology is protected by patent U.S. Patent No. 7,844,037 ("the '037 patent").  And, like other Palm inventions, Apple uses the '037 patent without permission.  For example, when an incoming call is received by an iPhone, the iPhone displays to a user the option to accept or decline the incoming call. The display also presents a messaging option, whereby a user can choose to text the caller, and a user eithers selects a stock message (*e.g.*, "Can I call you later?") or can customize a message to be sent to the caller.

32.    All of these Palm inventions—owned by Qualcomm—have vastly improved the functionality of mobile devices and the user experience, and all of them are widely found in Apple products without license or permission.

**TouchTable Patents**

33.    In June 2013, Qualcomm invested in a portfolio of patents formerly held by TouchTable Inc., a business unit of the multidisciplinary innovation firm Applied Minds.  Applied Minds was founded in 2000 by technology visionaries Dr. Daniel Hillis and Bran Ferren.  Hillis, a pioneer in parallel supercomputing, and Ferren, an Academy Award-winning visual-effects expert, met while working at Walt Disney's acclaimed "Imagineering" division.  The two eventually left Disney in 2000 to form Applied Minds, which was self-described as "the little Big Idea company."

34.    One of Hillis' and Ferren's numerous inventions is the "TouchTable." The TouchTable, resembling a table with a touch-sensitive display in place of the

table's surface, was designed to be manipulated by a user's touch rather than a mouse, keyboard, or other input device.  For example, the TouchTable can be used to display maps—similar to a large paper map spread out on a table, but one that allows for methods of user interactions that would be impossible for a static map.

35.     Because the TouchTable was designed to allow multiple users to work collaboratively and without the need for an extrinsic input device, Hillis and Ferren developed touch gestures that users could use to interact directly with the display. The gestures needed to be complex enough to allow users to manipulate the display in ways that provide sufficient control while still being intuitive enough to minimize the learning curve.

36.     Hillis and Ferren developed a device that understood a set of gestures to fulfill this need.  In the map example, the touch gestures developed by Hillis and Ferren allow a user to pan around a map simply by dragging a finger across the display, or to zoom into or out of the map by dragging fingers apart or together, respectively.  This multi-touch technology is protected by U.S. Patent No. 8,665,239 ("the '239 patent") and is used by Apple without permission or license.

### The Accused Devices

37.     As set forth below, a variety of Apple's devices—including certain of Apple's iPhones and iPads—practice one or more of the Patents-in-Suit.

### The Patents-in-Suit

38.     The following patents are infringed by Apple ("Patents-in-Suit"): U.S. Patent No. 8,683,362 ("the '362 patent"), U.S. Patent No. 8,497,928 ("the '928 patent"), U.S. Patent No. 8,665,239 ("the '239 patent"), U.S. Patent 9,203,940 (the '940 patent), and U.S. Patent No. 7,844,037 ("the '037 patent").

39.     As described below, Apple has been and is still infringing, contributing to infringement, and/or inducing others to infringe the Patents-in-Suit by making, using, offering for sale, selling, or importing devices that practice the Patents-in-

Suit.  Apple's acts of infringement have occurred within this District and elsewhere throughout the United States.

### U.S. Patent No. 8,683,362

40.     The '362 patent was duly and legally issued on March 25, 2014 to Qualcomm, which is the owner of the '362 patent and has the full and exclusive right to bring actions and recover damages for Apple's infringement of the '362 patent.  The '362 patent is valid and enforceable.  A copy of the '362 patent is attached hereto as Exhibit A.

41.     The '362 patent relates to a multitasking user interface to display different, concurrently running applications as "cards" and allow a user to take various actions on the "cards," such as moving right or left to maneuver between applications.  '362 patent at Abstract; 9:65-10:13.  In addition, applications can be dismissed (*i.e.*, "closed") by moving or dragging a corresponding card in an upwards direction via a touchscreen display.  *Id.* at 12:11-20.

### U.S. Patent No. 8,497,928

42.     The '928 patent was duly and legally issued on July 31, 2007, and Qualcomm is the current owner of the '928 patent and has the full and exclusive right to bring action and recover damages for Apple's infringement of the '928 patent.  The '928 patent is valid and enforceable.  A copy of the '928 patent is attached hereto as Exhibit B.

43.     The '928 patent relates to focusing a digital camera using a touchscreen display.  For example, a user may select an area on a touchscreen display where a focal point is desired, and the coordinates of that area may then be used to adjust the focal point.  '928 patent at 9:8-21.  Also, depending on the light condition associated with the new focal point, the flash intensity may be adjusted.  *Id*. at 10:19-22.

### U.S. Patent No. 8,665,239

44.     The '239 patent was duly and legally issued on March 4, 2014, and Qualcomm is the current owner of the '239 patent and has the full and exclusive

1  right to bring action and recover damages for Apple's infringement of the '239

2  patent.  The '239 patent is valid and enforceable.  A copy of the '239 patent is

3  attached hereto as Exhibit C.

4  45.  The '239 patent relates to a computing device with a touch-sensitive

5  display that recognizes certain permitted gestures performed by the user on the

6  displayed subject matter.  '239 patent at 2:13-28; 3:10-26.  In response to a

7  recognized gesture performed on the display, the device will perform a pre-

8  determined operation on the displayed imagery such that the user can manipulate

9  that imagery.  *Id.* at 3:10-38.  The degree of the operation performed in response to

10  the gesture can depend on the magnitude of the gesture.  *Id.*  Pre-set gestures

11  involving multiple touches, or touches of varying force, speed, length, or intensity,

12  are disclosed as well.  *Id.* at 3:10-14; 6:60-65.  The recognition of a gesture by the

13  device, or a modification caused by a gesture, or both, depend on the magnitude of

14  at least one of the user's touches.  *Id.* at 6:60-65.

15  **U.S. Patent No. 9,203,940**

16  46.  The '940 patent was duly and legally issued on December 1, 2015 to

17  Qualcomm, which is the owner of the '940 patent and has the full and exclusive

18  right to bring action and recover damages for Apple's infringement of the '940

19  patent.  The '940 patent is valid and enforceable.  A copy of the '940 patent is

20  attached hereto as Exhibit D.

21  47.  The '940 patent relates to the features of the power button on a mobile

22  device.   The claims disclose the ability to use a power button to control both the

23  computing and telephony functions of the device, such that the single power button

24  can silence a ring and also turn on the backlight of the display.  '940 patent at 1:59-

25  62.

26  **U.S. Patent No. 7,844,037**

27  48.  The '037 patent was duly and legally issued on November 30, 2010 to

28  Qualcomm, which is the owner of the '037 patent and has the full and exclusive

right to bring action and recover damages for Apple's infringement of the '037 patent.  The '037 patent is valid and enforceable.  A copy of the '037 patent is attached hereto as Exhibit E.

49.     The '037 patent generally relates to enabling a mobile device user to respond to an incoming call with a message instead of merely answering or declining the call.  '037 patent at 1:7-9.

COUNT 1 (PATENT INFRINGEMENT – U.S. PATENT NO. 8,683,362)

50.     Qualcomm repeats and re-alleges the allegations of paragraphs 1 through 49 above as if fully set forth herein.

51.     Qualcomm is the lawful owner of the '362 patent, and has the full and exclusive right to bring actions and recover damages for Apple's infringement of said patent.

52.     In violation of 35 U.S.C. § 271, Apple has been and is still infringing, contributing to infringement, and/or inducing others to infringe the '362 patent by making, using, offering for sale, selling, or importing mobile devices that practice the patent, such as Apple devices running iOS 7 and above, including but not limited to iPhone 4, iPhone 4S, iPhone 5, iPhone 5S, iPhone 5C,  iPhone 6, iPhone 6 Plus, iPhone 6S, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPad Pro, iPad Air and later, iPad (3rd gen) and later, iPad 2, and iPad mini.

53.     The accused devices have a touch-sensitive display screen with a physical button coupled to a processor.  The accused devices can also run at least two applications concurrently and can transition from displaying one application in a "full screen" mode to a multiple application "card" mode (also referred to as a "windowed" mode) and vice versa.  In particular, "card" mode is one view where the current application and other running applications are displayed as cards.  The user may move or drag cards corresponding to the currently running applications in a first direction, such as left or right, to view and/or select the cards.  To dismiss a

currently running application, the user may move or drag the corresponding card in a different (second) direction, such as upwards.

54.     The accused devices infringe at least claims 1, 2, 3, 5, 8, 9, and 11 of the '362 patent.  Regarding claim 1, Apple's iOS devices are computer systems on handheld mobile computing devices comprised of a Home button and a touch-sensitive display screen, both of which are coupled to an application processor in order to process button press events or touch gesture events, respectively.  The accused devices may operate in two display modes: (1) the normal application interface; and (2) the "app switching" interface.[7]  A user may switch between the two display modes by double-tapping the Home button.[8]  The iOS devices support "multitasking" and can run at least two applications concurrently.[9]  The normal application interface displays a single application in full screen mode.  App switching mode may be initiated by double-clicking the Home button, which will display a card having contents of one application and portions of cards corresponding to the other concurrently running applications.[10]  While in app switching mode, users may scroll through the cards corresponding to the concurrently running applications in a first direction, i.e., left or right.[11]  Further, users may dismiss one of the applications by moving or dragging its corresponding card in a second direction (different from the first direction), i.e., upwards.[12]  Thus, the accused devices infringe claim 1 of the '362 patent.

---

[7]  https://support.apple.com/en-us/HT202070.

[8]  Id.

[9]  https://www.apple.com/iphone-6s/specs/.

[10]  https://support.apple.com/en-us/HT202070.

[11]  Id.

[12]  https://support.apple.com/en-gb/HT201330.

55.     Regarding claim 2 of the '362 patent, in app switching mode, the user may scroll through the cards in a horizontal direction (*i.e.*, swiping left or right) and may dismiss an application by swiping its corresponding card in a vertical direction (*i.e.*, swiping up).  Thus, the accused devices infringe claim 2 of the '362 patent.

56.     Regarding claim 3 of the '362 patent, the user may dismiss applications while in app switching mode by moving or dragging the application's corresponding card upwards.  Thus, the accused devices infringe claim 3 of the '362 patent.

57.     Regarding claim 5 of the '362 patent, while in app switching mode, static representations of concurrently running applications are displayed on their respective cards.  Thus, the accused devices infringe claim 5 of the '362 patent.

58.     Regarding claim 8 of the '362 patent, the app switching mode is implemented on the accused devices, which include mobile computing devices.  Thus, the accused devices infringe claim 8 of the '362 patent.

59.     Regarding claim 9 of the '362 patent, the mobile computing devices in which app switching mode is implemented are handheld devices.  Thus, the accused devices infringe claim 9 of the '362 patent.

60.     Regarding claim 11 of the '362 patent, while in app switching mode, in response to dismissal of a card by moving or dragging the card in the second direction, the adjacent cards are shifted to fill the void left by the dismissed card.[13]  Thus, the accused devices infringe claim 11 of the '362 patent.

61.     On information and belief, Apple is currently and, unless enjoined, will continue to actively induce and encourage infringement of the '362 patent.  Apple has known of the '362 patent at least since the time this complaint was filed and served on Apple.  On information and belief, Apple nevertheless actively encourages others to infringe the '362 patent.  On information and belief, Apple knowingly induces infringement by others, including resellers, retailers, and end

---

[13]   https://support.apple.com/en-gb/HT201330.

users of the accused devices.  For example, Apple's customers and the end users of the Accused Devices test and/or operate the Accused Devices in the United States in accordance with Apple's instructions contained in, for example, its user manuals, thereby also performing the claimed methods and directly infringing the asserted claims of the Asserted Patents requiring such operation.  These facts give rise to a reasonable inference that Apple knowingly induces others, including resellers, retailers, and end users, to directly infringe the '362 patent, and that Apple possesses a specific intent to cause such infringement.

62.    Apple also contributes to infringement of the '362 patent by selling for importation into the United States, importing into the United States, and/or selling within the United States after importation the accused devices and the non-staple constituent parts of those devices, which are not suitable for substantial non-infringing use and which embody a material part of the invention described in the '362 patent.  These mobile electronic devices are known by Apple to be especially made or especially adapted for use in the infringement of the '362 patent.  Apple also contributes to the infringement of the '362 patent by selling for importation into the United States, importing into the United States, and/or selling within the United States after importation components, such as the chipsets or software containing the infringing functionality, of the accused devices, which are not suitable for substantial non-infringing use and which embody a material part of the invention described in the '362 patent.  These mobile devices are known by Apple to be especially made or especially adapted for use in the infringement of the '362 patent. Specifically, on information and belief, Apple sells the accused devices to resellers, retailers, and end users with knowledge that the devices are used for infringement. End users of those mobile electronic devices directly infringe the '362 patent.

63.    Apple's acts of infringement have occurred within this district and elsewhere throughout the United States.

64.    Qualcomm has been damaged and will suffer additional damages and irreparable harm unless Apple is enjoined from further infringement.  Qualcomm will prove its irreparable harm and damages at trial.

COUNT 2 (PATENT INFRINGEMENT – U.S. PATENT NO. 8,497,928)

65.    Qualcomm repeats and re-alleges the allegations of paragraphs 1 through 49 above as if fully set forth herein.

66.    Qualcomm is the lawful owner of the '928 patent and has the full and exclusive right to bring actions and recover damages for Apple's infringement of said patent.

67.    In violation of 35 U.S.C. § 271, Apple has been and is still infringing, contributing to infringement, and/or inducing others to infringe the '928 patent by making, using, offering for sale, selling, or importing devices that practice the patent, such as Apple devices that support "tap/touch to focus," including but not limited to the iPhone 3G S, iPhone 4, iPhone 4S, iPhone 5, iPhone 5C, iPhone 5S, iPhone 6, iPhone 6 Plus, iPhone 6S, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPad Pro, iPad Air and later, iPad (3rd gen) and later, and iPad mini and later.

68.    The accused devices infringe at least claims 1, 2, 3, 4, 6, 8, 11, and 13 of the '928 patent.  Regarding claim 1, the iPhone 7, and on information and belief, the other accused devices, contain an A10 processor, an image signal processor, and a "Six-element lens" (in the rear-facing camera) with "Autofocus with Focus Pixels" and "Optical image stabilization."  The iPhone's autofocus feature incorporates an actuator which, on information and belief, adjusts at least one lens position in the camera module to focus on images seen or captured through the camera.  The iPhone's image stabilization feature also includes "a sensor [which] helps the lens counteract even the tiniest movement."[14]  When the iOS camera application is

---

[14]  *See* https://www.apple.com/newsroom/2017/01/behind-apples-new-campaign-one-night-on-iphone-7/

launched in its preview mode, it displays a real-time image of the scene observed through the camera with a default first focal point, typically in the center of the image. The application indicates and highlights the first focal point with a yellow square overlaid on the real-time displayed image. The user can tap on a location on the displayed real-time image captured by the camera to autofocus on that point in the image, or the user can press and hold on any point in the image to autofocus on that point and engage the "AE/AF Lock" mode, which selects and maintains a new focal point in the image. Apple's website markets this feature as "Tap to focus with Focus Pixels."[15]  The new focal point is depicted on an iPhone by a smaller yellow square overlaid on the real-time displayed camera image at the location of the second focal point.

69.  The iPhone components that are used to implement the camera's "Autofocus with Focus Pixels" feature include the image sensor, which contains the "Focus Pixels," and the A10 chip with its built-in image signal processor. Apple's website states that the image signal processor permits "faster focus." The iPhone takes the user's touch input and then controls the focus of the camera to achieve focus at the desired location in the image. In the native camera application in iOS 10 on an iPhone, a focal point selection by the user causes the focal setting of the lens component to adjust from the first, default focal point to the second, user-selected focal point. As part of this adjustment process, on information and belief, appropriate control signals are sent to the actuator in the camera module, and that actuator in turn moves at least one element in the camera's six-element lens.

70.  Apple's website states that the iPhone 7 contains a "Quad-LED True Tone flash." The user interface in the native camera application in iOS 10 has an "auto" mode for the flash and uses software modules to determine whether, and how, the flash is operated given a set of lighting conditions and user inputs. The

---

[15]  *See id.*

Apple website states that the iPhone camera functionality includes a "Backside illumination sensor" and "Exposure control," for example.  The iPhone adjusts flash intensity in the manner described by the '928 patent.  For example, on information and belief, when the camera application is in preview mode and a user presses-and-holds on a dark location on the displayed image, the flash will activate when taking a picture in "auto" flash mode.  Conversely, when the user presses-and-holds a bright location in the exact same displayed image, the flash will not activate when taking a picture in "auto" flash mode.  This behavior demonstrates that the iPhone selects a flash value based on the user-selected focal point.  Moreover, when capturing an image in "auto" flash mode, the flash is activated with the flash level value that was selected based on the user's input.  Images are captured in response to various user inputs, including pressing a capture icon on the touchscreen display.  Thus, the accused devices infringe claim 1 of the '928 patent.

71.     With respect to claim 2 of the '928 patent, on information and belief, the iPhone's display determines and sends to the "focal point selection module" the coordinates of the second focal point selected by the user.  Thus, the accused devices infringe claim 2 of the '928 patent.

72.     With respect to claim 3 of the '928 patent, the iPhone's display provides a "pointer component," via a square overlaid on the displayed image on the touchscreen display, that displays the location to the focal point selected by the user.  Thus, the accused devices infringe claim 3 of the '928 patent.

73.     With respect to claim 4 of the '928 patent, the "focus control signals" specify a focal length for the iPhone's "lens component."  Thus, the accused devices infringe claim 4 of the '928 patent.

74.     With respect to claim 6 of the '928 patent, a "white balance control module" modifies the white balance of the image based on the newly-selected focal point.  Thus, the accused devices infringe claim 6 of the '928 patent.

75.     With respect to claims 7 and 10 of the '928 patent, one or more processors in the accused mobile devices perform the claimed "method for operating."  The accused devices also contain "a non-transitory computer readable storage medium storing instructions, the instructions when executed by one or more processors cause the processors to perform" the claimed method.   The method includes the native camera application in the iPhone 7, for example, displaying an image provided by the iPhones' "lens component," and that application presenting the image with a default, "first focal point."  The iPhone 7 permits the user to select a different focal point by providing one type of input on the displayed image on the touchscreen display.  The iPhone 7 refocuses the device's camera lens to the newly-selected focal point while the touchscreen display shows the image captured by the camera.  The newly-selected focal point is used by the iPhone 7 to select a "flash level value" which corresponds to the flash intensity for the camera's flash component.  The iPhone 7 allows the user to provide a second type of input on the touchscreen display to capture the displayed image (using the chosen "flash level value").   Thus, the accused devices infringe claims 7 and 10 of the '928 patent.

76.     With respect to claims 8 and 11 of the '928 patent, refocusing the accused devices' lens component on the newly-selected focal point includes the generation of coordinates for the new focal point.  Thus, the accused devices infringe claims 8 and 11 of the '928 patent.

77.     With respect to claim 13 of the '928 patent, the method employed by the accused devices, via one or more of their processors, includes adjusting the image's white balance setting based on the newly-selected focal point.  Thus, the accused devices infringe claim 13 of the '928 patent.

78.     On information and belief, Apple is currently, and unless enjoined, will continue to, actively induce and encourage infringement of the '928 patent.  Apple has known of the '928 patent at least since the time this complaint was filed and served on Apple.  On information and belief, Apple nevertheless actively

encourages others to infringe the '928 patent.  On information and belief, Apple knowingly induces infringement by others, including resellers, retailers, and end users of the accused devices.  For example, Apple's customers and the end users of the Accused Devices test and/or operate the Accused Devices in the United States in accordance with Apple's instructions contained in, for example, its user manuals, thereby also performing the claimed methods and directly infringing the asserted claims of the Asserted Patents requiring such operation.  These facts give rise to a reasonable inference that Apple knowingly induces others, including resellers, retailers, and end users, to directly infringe the '928 patent, and that Apple possesses a specific intent to cause such infringement.

79.     Apple also contributes to infringement of the '928 patent by selling for importation into the United States, importing into the United States, and/or selling within the United States after importation the accused devices and the non-staple constituent parts of those devices, which are not suitable for substantial non-infringing use and which embody a material part of the invention described in the '928 patent.  These mobile electronic devices are known by Apple to be especially made or especially adapted for use in the infringement of the '928 patent.  Apple also contributes to the infringement of the '928 patent by selling for importation into the United States, importing into the United States, and/or selling within the United States after importation components, such as the chipsets or software containing the infringing functionality, of the accused devices, which are not suitable for substantial non-infringing use and which embody a material part of the invention described in the '928 patent.  These mobile devices are known by Apple to be especially made or especially adapted for use in the infringement of the '928 patent.  Specifically, on information and belief, Apple sells the accused devices to resellers, retailers, and end users with knowledge that the devices are used for infringement.  End users of those mobile electronic devices directly infringe the '928 patent.

80.     Apple's acts of infringement have occurred within this district and elsewhere throughout the United States.

81.     Qualcomm has been damaged and will suffer additional damages and irreparable harm unless Apple is enjoined from further infringement.  Qualcomm will prove its irreparable harm and damages at trial.

<u>COUNT 3 (PATENT INFRINGEMENT – U.S. PATENT NO. 8,665,239)</u>

82.     Qualcomm repeats and re-alleges the allegations of paragraphs 1 through 49 above as if fully set forth herein.

83.     Qualcomm is the lawful owner of the '239 patent, and has the full and exclusive right to bring actions and recover damages for Apple's infringement of said patent.

84.     In violation of 35 U.S.C. § 271, Apple has been and is still infringing, contributing to infringement, and/or inducing others to infringe the '239 patent by making, using, offering for sale, selling, or importing devices that practice the patent, including but not limited to Apple devices that support "3D Touch," including but not limited to the iPhone 6S, iPhone 6S Plus, iPhone 7, and iPhone 7 Plus.

85.     The accused devices allow the user to perform certain pre-defined gestures on a touch-sensitive display, using one or more touches on the display, that perform pre-defined operations modifying the displayed subject matter.  The accused devices determine the magnitude (for example, length or force) of a user's touch inputs.  The operations performed by the gestures depend, in part, on the determined magnitude of those inputs.

86.     The accused devices infringe at least claims 1, 2, 3, and 4 of the '239 patent.  Apple's iPhone devices starting from iPhone 6 and on incorporate the infringing functionality.  Regarding claim 1, iPhone 7, for example, is comprised of a touch-sensitive display surface and the Apple A10 processor with embedded M10 motion coprocessor coupled to a Samsung K3RG1G10CM 2-GB LPDDR4 memory

1  and Toshiba THGBX6T0T8LLFXE 128 GB NAND memory IC.[16]  The underlying

2  operating system, iOS, includes a UIKit framework stored in digital data storage and

3  contains a record of gesture recognizer classes executable by touching the display,

4  such as pinch to zoom, pan or drag, swipe, and rotate.[17]  A gesture recognizer may

5  be attached to a view and will interpret the touch gesture events to that view.[18]

6  When a pattern match is detected, the gesture recognizer notifies a view controller to

7  modify the subject matter presented in the view based on the operation associated

8  with that gesture.[19]  Software instructions in the accused devices, including the

9  UITouch framework in iOS, may track the magnitude of an input (for example,

10  length or force) and use that information to determine whether a particular gesture

11  has occurred, and the manner in which subject matter presented on the display

12  should be modified.[20]  Thus, the accused devices infringe claim 1 of the '239 patent.

13          87.     Regarding claim 2 of the '239 patent, the method of claim 1 is

14  performed based on properties of the user's touch detected, which include the

15  current length, area, intensity, and force as well as length, area, intensity, and force

16  history.  Thus, the accused devices infringe claim 2 of the '239 patent.

17

18  _____

19  [16]  https://www.apple.com/iphone-7/specs/; http://www.techinsights.com/about-techinsights/overview/blog/apple-iphone-7-teardown/.

20  [17]  https://developer.apple.com/library/content/documentation/EventHandling/
21  Conceptual/EventHandlingiPhoneOS/index.html.

22  [18]  https://developer.apple.com/library/content/documentation/EventHandling/
Conceptual/EventHandlingiPhoneOS/index.html#//apple_ref/doc/uid/TP40009541-
23  CH3-SW1.

24  [19]  *Id.*

25  [20]  https://developer.apple.com/library/content/documentation/EventHandling/
26  Conceptual/EventHandlingiPhoneOS/HandlingTouchesinYourView.html#//apple_re
f/doc/uid/TP40009541-CH16-SW1;
27  https://developer.apple.com/library/content/documentation/EventHandling/
Conceptual/EventHandlingiPhoneOS/Respondingto3DTouchEvents.html#//apple_re
28  f/doc/uid/TP40009541-CH19-SW1.

88.     Regarding claim 3 of the '239 patent, the accused devices contain executable machine-readable instructions to execute claim 1 of the '239 patent, where a gesture recognizer will interpret and execute gestures performed by the user based on the operation associated with the user gesture.  Thus, the accused devices infringe claim 3 of the '239 patent.

89.     Regarding claim 4, the method in claim 3 is performed based on properties of the user's touch detected, which include the current length, area, intensity, and force as well as length, area, intensity, and force history.  Thus, the accused devices infringe claim 4 of the '239 patent.

90.     On information and belief, Apple is currently, and unless enjoined, will continue to, actively induce and encourage infringement of the '239 patent.  Apple has known of the '239 patent at least since the time this complaint was filed and served on Apple.  On information and belief, Apple nevertheless actively encourages others to infringe the '239 patent.  On information and belief, Apple knowingly induces infringement by others, including resellers, retailers, and end users of the accused devices.  For example, Apple's customers and the end users of the Accused Devices test and/or operate the Accused Devices in the United States in accordance with Apple's instructions contained in, for example, its user manuals, thereby also performing the claimed methods and directly infringing the asserted claims of the Asserted Patents requiring such operation.  These facts give rise to a reasonable inference that Apple knowingly induces others, including resellers, retailers, and end users, to directly infringe the '239 patent, and that Apple possesses a specific intent to cause such infringement.

91.     Apple also contributes to infringement of the '239 patent by selling for importation into the United States, importing into the United States, and/or selling within the United States after importation the accused devices and the non-staple constituent parts of those devices, which are not suitable for substantial non-infringing use and which embody a material part of the invention described in the

'239 patent.  These mobile electronic devices are known by Apple to be especially made or especially adapted for use in the infringement of the '239 patent.  Apple also contributes to the infringement of the '239 patent by selling for importation into the United States, importing into the United States, and/or selling within the United States after importation components, such as the chipsets or software containing the infringing functionality, of the accused devices, which are not suitable for substantial non-infringing use and which embody a material part of the invention described in the '239 patent.  These mobile devices are known by Apple to be especially made or especially adapted for use in the infringement of the '239 patent. Specifically, on information and belief, Apple sells the accused devices to resellers, retailers, and end users with knowledge that the devices are used for infringement. End users of those mobile electronic devices directly infringe the '239 patent.

92.     Apple's acts of infringement have occurred within this district and elsewhere throughout the United States.

93.     Qualcomm has been damaged and will suffer additional damages and irreparable harm unless Apple is enjoined from further infringement.  Qualcomm will prove its irreparable harm and damages at trial.

<u>COUNT 4 (PATENT INFRINGEMENT – U.S. PATENT NO. 9,203,940)</u>

94.     Qualcomm repeats and re-alleges the allegations of paragraphs 1 through 49 above as if fully set forth herein.

95.     Qualcomm is the lawful owner of the '940 patent, and has the full and exclusive right to bring actions and recover damages for Apple's infringement of said patent.

96.     In violation of 35 U.S.C. § 271, Apple has been and is still infringing, contributing to infringement, and/or inducing others to infringe the '940 patent by making, using, offering for sale, selling, or importing mobile devices that practice the patent, including but not limited to the iPhone 4, iPhone 5, iPhone 6, iPhone 6S,

iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPad mini 4, and the 12.9" 2015 iPad Pro.

97. The accused devices include a power button function capable of controlling both the computing and telephony functions of the device, whereby a single power button can silence a ring and also turn on the backlight of the display.

98. The accused devices infringe at least claims 1, 2, 3, 4, 7, 10, 11, 12, 13, 14, 15, 18, 21, and 22 of the '940 patent.

99. Regarding claim 1, Apple's iOS devices are mobile computing devices comprising of a display, a power button, and a processor. The accused devices present a notification on the display when a telephone call is being received. For example, when an iPhone receives an incoming call the notification will appear indicating the name or number of the person calling.  A user may then silence a ring associated with the telephone call by pressing the power button without turning off the mobile computing device. When a telephone call is not being received, the power button activates a backlight of the display. Thus, the accused devices infringe claim 1 of the '940 patent.

100. Regarding claims 2 and 3, the accused devices have a display located on the first face of the computing device while the power button is located on a second, different, face of the computing device. The first face is a front surface of the device. Thus, the accused devices infringe claims 2 and 3 of the '940 patent.

101. Regarding claim 4, the user of the device is able to press the power button to power off the device when not receiving a telephone call. The instructions of the accused devices also enables the power button, when pressed, to power off the device when not receiving a telephone call. Thus, the accused devices infringe claim 4 of the '940 patent.

102. Regarding claim 7, the user of the device is able to answer a telephone call by selecting an icon presented on the display. Thus, the accused devices infringe claim 7 of the '940 patent.

103.   Regarding claims 10 and 11, the accused devices include a ringer switch that when in a first state causes the device to ring when a telephone call is being received and when in a second state, to vibrate the device when the call is being received.  When the ringer switch is in the first state, the user pressing the power button causes the device to stop vibrating.  Thus, the accused devices infringe claims 10 and 11 of the '940 patent.

104.   Regarding claim 12, Apple's iOS devices are mobile computing devices comprised of a radio, a display, a power button, a processor, and memory storing instructions that allow the computing device to present a notification on the display when a telephone call is being received. For example, when an iPhone receives an incoming call the notification will appear indicating the name or number of the person calling.  A user may then silence a ring associated with the telephone call by pressing the power button without turning off the mobile computing device. When a telephone call is not being received, the power button activates a backlight of the display. Thus, the accused devices infringe claim 12 of the '940 patent.

105.   Regarding claims 13 and 14, the accused devices have a display located on the first face of the computing device while the power button is located on a second, different, face of the computing device. The first face is a front surface of the device. Thus, the accused devices infringe claims 13 and 14 of the '940 patent.

106.   Regarding claim 15, the instructions of the mobile computing device enables the power button, when pressed, to power off the device when not receiving a telephone call. The instructions of the accused devices also enables the power button, when pressed, to power off the mobile device when not receiving a telephone call. Thus, the accused devices infringe claim 15 of the '940 patent.

107.    Regarding claim 18, the instructions of the mobile computing device enable the user to answer a telephone call by selecting an icon presented on the display. Thus, the accused devices infringe claim 18 of the '940 patent.

108.   Regarding claims 21 and 22, the instructions of the accused devices include a ringer switch that when in a first state causes the device to ring when a telephone call is being received and when in a second state, to vibrate the device when the call is being received.  When the ringer switch is in the first state, the user pressing the power button causes the device to stop vibrating.  Thus, the accused devices infringe claims 21 and 22 of the '940 patent.

109.   On information and belief, Apple is currently, and unless enjoined, will continue to, actively induce and encourage infringement of the '940 patent.  Apple has known of the '940 patent at least since the time this complaint was filed and served on Apple.  On information and belief, Apple nevertheless actively encourages others to infringe the '940 patent.  On information and belief, Apple knowingly induces infringement by others, including resellers, retailers, and end users of the accused devices.  For example, Apple's customers and the end users of the Accused Devices test and/or operate the Accused Devices in the United States in accordance with Apple's instructions contained in, for example, its user manuals, thereby also performing the claimed methods and directly infringing the asserted claims of the Asserted Patents requiring such operation.  These facts give rise to a reasonable inference that Apple knowingly induces others, including resellers, retailers, and end users, to directly infringe the '940 patent, and that Apple possesses a specific intent to cause such infringement.

110.   Apple also contributes to infringement of the '940 patent by selling for importation into the United States, importing into the United States, and/or selling within the United States after importation the accused devices and the non-staple constituent parts of those devices, which are not suitable for substantial non-infringing use and which embody a material part of the invention described in the '940 patent.  These mobile electronic devices are known by Apple to be especially made or especially adapted for use in the infringement of the '940 patent.  Apple also contributes to the infringement of the '940 patent by selling for importation into

the United States, importing into the United States, and/or selling within the United States after importation components, such as the chipsets or software containing the infringing functionality, of the accused devices, which are not suitable for substantial non-infringing use and which embody a material part of the invention described in the '940 patent.  These mobile devices are known by Apple to be especially made or especially adapted for use in the infringement of the '940 patent. Specifically, on information and belief, Apple sells the accused devices to resellers, retailers, and end users with knowledge that the devices are used for infringement. End users of those mobile electronic devices directly infringe the '940 patent.

111.   Apple's acts of infringement have occurred within this district and elsewhere throughout the United States.

112.   Qualcomm has been damaged and will suffer additional damages and irreparable harm unless Apple is enjoined from further infringement.  Qualcomm will prove its irreparable harm and damages at trial.

<u>COUNT 5 (PATENT INFRINGEMENT – U.S. PATENT NO. 7,844,037)</u>

113.   Qualcomm repeats and re-alleges the allegations of paragraphs 1 through 49 above as if fully set forth herein.

114.   Qualcomm is the lawful owner of the '037 patent, and has the full and exclusive right to bring actions and recover damages for Apple's infringement of said patent.

115.   In violation of 35 U.S.C. § 271, Apple has been and is still infringing, contributing to infringement, and/or inducing others to infringe the '037 patent by making, using, offering for sale, selling, or importing devices that practice the patent, such as all versions of the iPhone and potentially all versions of the iPads. The accused devices are capable of enabling a mobile device user to respond to an incoming call with a message instead of merely answering or declining the call.  The accused devices infringe at least claims 1, 7, 8, and 9 of the '037 patent.

TBD

116.   Regarding claim 1, the accused devices allow users to respond to a phone call with a text message. For example, when a call is received, the iPhone displays the option to accept or decline the incoming call as well as displaying a messaging option, whereby a user can choose to text the caller. The user can then select to send a stock message or a customized message to the caller. The message is sent to a user of the second computing device as recited from claim 1. Thus, the accused devices infringe claim 1 of the '037 patent.

117.   Regarding claim 7 of the '037 patent, the accused device will verify that the second computing device is enabled for receiving the message. In the case of the iPhone, an iMessage is used when the incoming call is from an iPhone that has its iMessage feature enabled.[21] To this effect, iPhone verifies whether the second computing device is able to receive the iMessage and, only after such a determination has been done, sends the iMessage to the calling second computing device. Thus, the accused devices infringe claim 7 of the '037 patent.

118.   Regarding claim 8 of the '037 patent, on information and belief, the accused devices verification of the second device includes "identifying a phone number of the other computing device used for the incoming call," and "determining that the phone number is associated with a message-enabled device" that can handle an instant message response. The iPhone identifies the second computing device's phone number and determines whether the second computing device can receive an

---

[21]   iMessage is a messaging architecture that enables Apple devices such as iPhone, iPad and iPod to communicate with each other. These are NOT SMS/MMS and iMessages are sent only to other devices built by Apple."iMessages are texts, photos, or videos that you send to iOS devices and Macs over Wi-Fi or cellular-data networks. These messages appear in blue text bubbles." https://support.apple.com/en-us/HT207006.  "SMS/MMS messages are texts and photos that you send to other cell phones or iOS devices. These messages appear in green text bubbles on your device." *Id*.

iMessage (instant message). Thus, the accused devices infringe claim 8 of the '037 patent.

119. Regarding claim 9 of the '037 patent, on information and belief, the accused devices determining that the second computing device is capable of receiving a message includes "accessing a contact record of a caller of the incoming call," and "using the contact record to verify that the phone number is capable of being used to receive the message" as recited from claim 9. For example, the iPhone does this by checking Apple's cloud servers to determine whether the second computing device's contact record exits and whether there is an indication that the second computing device has enabled iMessaging. Thus, the accused devices infringe claim 9 of the '037 patent.

120. On information and belief, Apple is currently, and unless enjoined, will continue to, actively induce and encourage infringement of the '037 patent. Apple has known of the '037 patent at least since the time this complaint was filed and served on Apple. On information and belief, Apple nevertheless actively encourages others to infringe the '037 patent. On information and belief, Apple knowingly induces infringement by others, including resellers, retailers, and end users of the accused devices. For example, Apple's customers and the end users of the Accused Devices test and/or operate the Accused Devices in the United States in accordance with Apple's instructions contained in, for example, its user manuals, thereby also performing the claimed methods and directly infringing the asserted claims of the Asserted Patents requiring such operation. These facts give rise to a reasonable inference that Apple knowingly induces others, including resellers, retailers, and end users, to directly infringe the '037 patent, and that Apple possesses a specific intent to cause such infringement.

121. Apple also contributes to infringement of the '037 patent by selling for importation into the United States, importing into the United States, and/or selling within the United States after importation the accused devices and the non-staple

constituent parts of those devices, which are not suitable for substantial non-infringing use and which embody a material part of the invention described in the '037 patent. These mobile electronic devices are known by Apple to be especially made or especially adapted for use in the infringement of the '037 patent. Apple also contributes to the infringement of the '037 patent by selling for importation into the United States, importing into the United States, and/or selling within the United States after importation components, such as the chipsets or software containing the infringing functionality, of the accused devices, which are not suitable for substantial non-infringing use and which embody a material part of the invention described in the '037 patent. These mobile devices are known by Apple to be especially made or especially adapted for use in the infringement of the '037 patent. Specifically, on information and belief, Apple sells the accused devices to resellers, retailers, and end users with knowledge that the devices are used for infringement. End users of those mobile electronic devices directly infringe the '037 patent.

122.   Apple's acts of infringement have occurred within this district and elsewhere throughout the United States.

123.   Qualcomm has been damaged and will suffer additional damages and irreparable harm unless Apple is enjoined from further infringement. Qualcomm will prove its irreparable harm and damages at trial.

## PRAYER FOR RELIEF

WHEREFORE, Qualcomm respectfully requests that the Court enter judgment as follows:

(a)   Declaring that Apple has infringed the Patents-in-Suit;

(b)   Awarding damages in an amount to be proven at trial, but in no event less than a reasonable royalty for its infringement including pre-judgment and post-judgment interest at the maximum rate permitted by law;

1      (c)    Ordering a permanent injunction enjoining Apple, its officers, agents,

2  servants, employees, attorneys, and all other persons in active concert or

3  participation with Apple from infringing the Patents-in-Suit;

4      (d)    Ordering an award of reasonable attorneys' fees to Qualcomm as

5  provided by 35 U.S.C. § 285;

6      (e)    Awarding expenses, costs, and disbursements in this action, including

7  prejudgment interest; and

8      (f)    Awarding such other and further relief as the Court deems just and

9  proper.

10  Dated:  November 29, 2017        *s/ Randall E. Kay*

11                             Randall E. Kay

12                             JONES DAY

13                             Karen P. Hewitt (SBN 145309)
                           kphewitt@jonesday.com

14                             Randall E. Kay (SBN 149369)
                           rekay@jonesday.com

15                             4655 Executive Drive, Suite 1500

16                             San Diego, California 92121

17                             Telephone:  (858) 314-1200
                           Facsimile:   (844) 345-3178

18

19                             QUINN EMANUEL URQUHART &
                           SULLIVAN, LLP

20                             David A. Nelson (*pro hac vice* forthcoming)

21                             (Ill. Bar No. 6209623)

22                             davenelson@quinnemanuel.com
                           500 West Madison St., Suite 2450

23                             Chicago, Illinois 60661
                           Telephone:  (312) 705-7400

24                             Facsimile:  (312) 705-7401

25

26                             Alexander Rudis (*pro hac vice* forthcoming)
                           (N.Y. Bar No. 4232591)

27                             alexanderrudis@quinnemanuel.com
                           Patrick D. Curran (SBN 241630)

28                             patrickcurran@quinnemanuel.com

QUALCOMM INCORPORATED'S COMPLAINT FOR PATENT INFRINGEMENT

51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100

Sean S. Pak (SBN 219032)
seanpak@quinnemanuel.com
Andrew Holmes (SBN 260475)
drewholmes@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone:  (415) 875-6600
Facsimile:  (415) 875-6700

S. Alex Lasher (*pro hac vice* forthcoming)
(D.C. Bar No. 486212)
alexlasher@quinnemanuel.com
777 6th Street NW, 11th Floor
Washington, DC 20001
Telephone:  (202) 538-8000
Facsimile:  (202) 538-8100

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (*pro hac vice* forthcoming)
(N.Y. Bar No. 1475722)
echesler@cravath.com
Keith R. Hummel (*pro hac vice* forthcoming)
(N.Y. Bar No. 2430668)
khummel@cravath.com
Richard J. Stark (*pro hac vice* forthcoming)
(N.Y. Bar No. 2472603)
rstark@cravath.com
Gary A. Bornstein (*pro hac vice* forthcoming)
(N.Y. Bar No. 2916815)
gbornstein@cravath.com
J. Wesley Earnhardt (*pro hac vice* forthcoming)
(N.Y. Bar No. 4331609)
wearnhardt@cravath.com
Yonatan Even (*pro hac vice* forthcoming)
(N.Y. Bar No. 4339651 )
yeven@cravath.com

37

QUALCOMM INCORPORATED'S COMPLAINT FOR PATENT INFRINGEMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Vanessa A. Lavely (*pro hac vice* forthcoming)
(N.Y. Bar No. 4867412)
vlavely@cravath.com
Worldwide Plaza, 825 Eighth Avenue
New York, NY 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Attorneys for Plaintiff*
QUALCOMM INCORPORATED

<u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Qualcomm demands a jury trial on all issues triable by jury.

Dated:  November 29, 2017          *s/ Randall E. Kay*
                                   Randall E. Kay

JONES DAY
Karen P. Hewitt (SBN 145309)
kphewitt@jonesday.com
Randall E. Kay (SBN 149369)
rekay@jonesday.com
4655 Executive Drive, Suite 1500
San Diego, California 92121
Telephone:  (858) 314-1200
Facsimile:  (844) 345-3178

QUINN EMANUEL URQUHART & SULLIVAN, LLP
David A. Nelson (*pro hac vice* forthcoming)
(Ill. Bar No. 6209623)
davenelson@quinnemanuel.com
500 West Madison St., Suite 2450
Chicago, Illinois 60661
Telephone:  (312) 705-7400
Facsimile:  (312) 705-7401

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (*pro hac vice* forthcoming)
(N.Y. Bar No. 1475722)
echesler@cravath.com
Worldwide Plaza, 825 Eighth Avenue
New York, NY 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Attorneys for Plaintiff*
QUALCOMM INCORPORATED